IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ELISHA CINTRON, | ) | CASE NO. 1:11CV0142 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Elisha Cintron ("Cintron") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §1381 *et seq.*  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the following reasons, the final decision of the Commissioner should be AFFIRMED.

## I. Procedural History

On November 28, 2006, Cintron filed an application for SSI benefits, alleging a disability onset date of October 1, 2006.  Tr. 88-90.  Cintron claimed back pain and depression prevented her from working.  Tr. 59-61.  The state agency denied Cintron's claim initially on May 8, 2007 (Tr. 59-61), and upon reconsideration on September 26, 2007.  Tr. 66-68.  On October 26, 2007, Cintron filed a written request for a hearing (Tr. 69-70), and on October 26, 2009, a hearing was held before Administrative Law Judge Richard N. Staples (the "ALJ").  Tr. 19-56.  In a decision dated November 3, 2009, the ALJ determined that Cintron was not disabled or entitled to SSI benefits.  Tr. 6-18.  Cintron requested review of this decision by the Appeals Council on

November 16, 2009.  Tr. 4-5.  On November 22, 2010, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

On January 20, 2011, Cintron filed this action seeking review of the Commissioner's decision.  Doc. 1.  On August 17, 2011, Cintron filed her Brief on the Merits.  Doc. 16.  On October 31, 2011, the Commissioner filed his Brief on the Merits.  Doc. 19.

## II.  Evidence

### A.  Personal and Vocational Evidence

Cintron was born on May 31, 1978, and was twenty-eight years old at the time she filed her application for SSI benefits.  Tr. 88.  She completed ninth grade but left school because she had children.  Tr. 37, 100.  She is bilingual and is able to communicate in English and Spanish.  Tr. 37.  Cintron last worked in 2005 as a part-time security guard at Cleveland Browns Stadium.  Tr. 25-27.  At the time of the administrative hearing, Cintron lived with her two children (ages 10 and 13).

### B.  Medical Evidence

In the final three months of 2006, Cintron sought treatment from Leonor Osorio, D.O., for neck and back pain.  Tr. 148-151.  On October 26, 2006, Dr. Osorio found that Cintron had a severe muscle spasm in the trapezius.  Tr. 151.  Dr. Osorio noted that Cintron had a steady gait, that her muscle strength was 5/5 in the upper and lower extremities, that her reflexes were brisk, and that there was no active synovitis.  Tr. 151.

On November 27, 2006, Cintron presented to Dr. Osorio for complaints of neck pain.  Tr. 150.  Dr. Osorio found that Cintron had severe trapezius muscle spasms.  Tr. 150.  Dr. Osorio also noted that Cintron had steady gait, that she demonstrated good range of motion, and that her muscle strength was 5/5 in the upper and lower extremities.  Tr. 150.

On December 2, 2006, Cintron went to the emergency room with complaints of right shoulder and neck pain radiating into her right arm.  Tr. 142-143.  On examination, she had trouble lifting her arm.  Tr. 142.  She was discharged in good condition after a diagnosis of a cervical neck strain.  Tr. 143.

On December 6, 2006, Cintron reported to psychologist Karen Breer, Ph.D., and complained of stress and depression.  Tr. 195-196.  Cintron reported that she was not taking the full doses of her psychological medications because she worried that it would make her gain weight.  Tr. 196.  She also stated that she quit her job as a security guard in 2005 because it had become too stressful with her children.  Tr. 196.  Upon exam, Cintron's affect was flat and her mood was depressed.  Tr. 196.  She appeared to have average intelligence and her thoughts were organized.  Tr. 196.  Dr. Breer diagnosed major depressive disorder and instructed Cintron to take her medication, go to weekly counseling sessions, and exercise more.  Tr. 196.

On December 7, 2006, Cintron saw Dr. Osorio and complained of back pain and shortness of breath.  Tr. 149.  A review of her systems was normal.  Tr. 149.  An MRI on her cervical spine was negative, as was blood work for rheumatoid arthritis and lupus.  Tr. 149.  Dr. Osorio diagnosed post-asthma exacerbation, mid-back pain and neck pain, and etiology likely secondary to depression and trapezius spasm.  Tr. 149.  Dr. Osorio stated that Cintron has enough pain medication.  Tr. 149.

On April 19, 2007, state agency consultative psychologist, Sandy Felker, Ph.D., examined Cintron.  Tr. 157-160.  Cintron reported to Dr. Felker that she had life-long depression and stated that she was receiving psychological treatment.  Tr. 158.  She described herself as depressed, anxious, and irritable, and stated that she had trouble sleeping and had crying spells. Tr. 158.  Dr. Felker detected no delusions and no evidence of any paranoid, grandiose, or

unusual thinking. Tr. 158. Dr. Felker noted that Cintron's attention span and ability to concentrate were somewhat restricted and her insight and judgment were fair. Tr. 159. Dr. Felker diagnosed depression of an unspecified type. Tr. 159. She concluded that Cintron had a mild impairment in her ability to concentrate and attend to tasks. Tr. 159. Dr. Felker opined that Cintron's ability to understand and follow instructions was not impaired, but that her ability to carry out tasks was mildly to moderately impaired. Tr. 159. Dr. Felker found that Cintron had mild impairments in her ability to relate to others and deal with the general public, and moderate impairments in her ability to relate to work peers, supervisors and to tolerate the stress of employment. Tr. 159.

On May 2, 2007, state agency reviewing psychologist Joan Williams, Ph.D., completed a Psychiatric Review Technique form. Tr. 161-174. Dr. Williams diagnosed depression. Tr. 164. She found that Cintron was moderately impaired in social functioning. Tr. 171. She also concluded that Cintron was mildly impaired in her activities of daily living and maintaining concentration, persistence, or pace. Tr. 171. Dr. Williams found that Cintron had experienced no episodes of decompensation. Tr. 171. Dr. Williams also performed a mental residual functional capacity assessment and found Cintron to be capable of simple, routine tasks in a relatively static environment where she can mostly work alone. Tr. 175-77. In September 2007, state agency psychologist Karen Wasserman, Psy.D., affirmed this assessment. Tr. 221-222.

On May 3, 2007, state agency reviewing physician, Gerald Klyop, M.D., assessed Cintron's physical residual functional capacity. Tr. 179-186. Dr. Klyop diagnosed back pain and determined that Cintron was capable of occasionally lifting 50 pounds, frequently lifting 25 pounds, and standing/walking and sitting for six hours each in an eight-hour workday. Tr. 180. He found no other limitations. Tr. 179-186.

On May 23, 2007, Dr. Osorio filled out a Medical Assessment Questionnaire (Physical). Tr. 192-193. Dr. Osorio opined that Cintron could lift no more than two pounds and could not sit, stand, or walk for more than two hours per day, in one-hour intervals. Tr. 192-193. She also found that Cintron was completely unable to stoop, that she had significant manipulative limitations in both hands, and that she could only reach above and below shoulder level occasionally. Tr. 193. In addition, Dr. Osorio found that Cintron had moderate pain in her back, hips and neck due to fibromyalgia. Tr. 193.

On July 2, 2007, Cintron admitted herself to Lutheran Hospital for depression with suicidal thoughts. Tr. 238-249. She reported anxiety and panic attacks. Tr. 245. After one day at the hospital, Cintron asked to be discharged saying that she was "fine." Tr. 245. She was discharged with a diagnosis of major depressive disorder, generalized anxiety disorder, panic disorder, and fibromyalgia. Tr. 240.

Over the last six months of 2007 and into early 2008, Cintron saw Karen Jacobs, D.O., on several occasions for psychiatric complaints. Tr. 251-252, 256-257, 259-260. Cintron reported feeling depressed, lacking energy, irritability, and lacking focus and concentration. Tr. 251, 256, 259. She did not report suicidal thoughts. Tr. 251, 256, 259. Dr. Jacobs diagnosed major depressive disorder, anxiety disorder, and panic disorder. Tr. 252, 257, 260.

Dr. Jacobs filled out a Medical Assessment Questionnaire (Mental) on July 25, 2007. Tr. 219-220. She opined that Cintron had poor or no ability to relate to coworkers, deal with the public, interact with supervisors, deal with work stress, maintain attention and concentration, and perform detailed and complex tasks. Tr. 219-220. Dr. Jacobs stated that Cintron lacked energy and used all her energy to take care of her children. Tr. 219-220. She attributed Cintron's limitations to depression. Tr. 220.

On September 26, 2008, Cintron presented to Dr. Osorio with complaints of back pain. Tr. 336.  Cintron informed Dr. Osorio that she had recently traveled to Puerto Rico and that, other than back pain, she was doing well.  Tr. 336.  Although Cintron informed Dr. Osorio that her depression was not controlled, Dr. Osorio noted that Cintron did not appear overtly depressed or anxious during the examination.  Tr. 336.  Dr. Osorio noted a severe trapezius muscle spasm and upper back tenderness. Tr. 336.  Dr. Osorio found mid back pain secondary to muscle spasms, as well as fibromyalgia.  Tr. 336.

In the beginning months of 2009, Cintron saw Dr. Jacobs several times for counseling. On January 13, 2009, Dr. Jacobs reported that Cintron had good days and bad days, but that 5/7 days were better.  Tr. 357.  Cintron continued to experience anxiety and moodiness, but denied suicidal thoughts.  Tr. 357.  On March 25 2009, Cintron told Dr. Jacobs that her mood was not stable, that she was worried about being alone because she had just ended a relationship with her boyfriend, and that she was having trouble sleeping.  Tr. 349-352.  On June 8, 2009, Cintron reported sleep problems, but her mood was more calm and she was less depressed.  Tr. 346. Although her motivation was poor, she managed to keep the house clean, do dishes, and do the laundry.  Tr. 346.  Throughout these counseling sessions, Dr. Jacobs maintained her diagnosis of depressive disorder, anxiety disorder, and panic disorder.  Tr. 346, 350,358.

In March and April 2009, Cintron saw Dr. Osorio for headaches and neck and back pain. Tr. 331-332, 327-328.  Dr. Osorio continued to diagnose a trapezius muscle spasm, and offered a diagnosis of cervicalgia, malaise and fatigue, and myalgia and myositis.  Tr. 331-332.  She recommended that Cintron go swimming to help with the myalgia.  Tr. 332.

On September 28, 2009, Dr. Osorio filled out an additional Medical Assessment Questionnaire (Physical). Tr. 365-366.  She opined that Cintron could lift no more than two

pounds and could sit, stand, or walk for no more than two hours per day in thirty-minute intervals. Tr. 365-366. Dr. Osorio also opined that Cintron was completely unable to stoop and could reach above and below shoulder level only occasionally. Tr. 366. She stated Cintron's physical limitations were the result of chronic pain due to fibromyalgia. Tr. 365-366.

On October 22, 2009, Dr. Jacobs filled out an additional Medical Assessment Questionnaire (Mental). Tr. 368-369. She opined that Cintron had good or fair abilities in several work-adjustment related areas, but had poor or no ability to deal with work stressors or maintaining attention/concentration. Tr. 368. Dr. Jacobs further opined that Cintron had poor or no ability to understand, remember and carry out complex job instructions, but a "good" ability to do the same for simple job instructions. Tr. 369. Dr. Jacobs stated that Cintron's sleep disruption affected her ability to function during the day. Tr. 369. Dr. Jacobs attributed Cintron's limitations to "high levels of anxiety [and] depression." Tr. 368.

**C.     Testimonial Evidence**

    **1.     Cintron's Testimony**

On October 26, 2009, Cintron appeared with counsel and testified at the administrative hearing. Tr. 19-48. Cintron testified that, although she enjoyed her job as a security guard at Cleveland Browns Stadium, she stopped working in 2005 because of her mental condition and back pain. Tr. 27. She testified that she had fibromyalgia and took medication to help with her pain. Tr. 27. Cintron also took antidepressant medication and stated that she had no side effects from any medication. Tr. 28-29.

Cintron described her typical day as "hectic" because of the work she had to do with her children. Tr. 30. She stated that both of her children had ADHD and her youngest child was mentally retarded. Tr. 30. Cintron testified that, on a typical day, she would get up at 7:00 a.m.

and help both of her children get ready for school. Tr. 31. She stated that she drove her oldest child to school. Tr. 32. She testified that she would stay in her home during the day and watch television until her children returned home. Tr. 36-38. Cintron testified that she did laundry, cooked dinner for the kids, and was able to walk up and down the stairs in her two-story apartment. Tr. 31-34. In addition, she stated that she was able to attend school activities for her children. Tr. 30.

Cintron testified that she isolated herself in her house because she experienced mood swings and did not like to be around people. Tr. 39. However, she stated that she had no problems when she worked as a security guard at Cleveland Browns Stadium. Tr. 40. Cintron also testified that she was unable to work because she could not control herself and could not concentrate. Tr. 40, 44. She stated that she had suicidal thoughts, but her children kept her going. Tr. 42. Cintron reported that she once went to a hospital for a day and a half because of her suicidal thoughts, but was released after receiving medication. Tr. 43-44.

### 2. Vocational Expert's Testimony

Bruce Holderead, a vocational expert ("VE"), also testified at the hearing. Tr. 48-56. The VE testified that Cintron had not engaged in substantial gainful activity in her adult life. Tr. 49. In a hypothetical, the ALJ asked the VE whether a person could perform any job in the national economy if the individual had the same vocational factors as Cintron and the following limitations: could lift, carry, push and/or pull about 10 pounds frequently and 20 pounds occasionally; could sit and stand/walk for six hours in an eight-hour workday with normal breaks; limited to unskilled work involving simple, repetitive tasks with no high productions quotas; and limited to no more than superficial interaction with the public or co-workers. Tr. 51. The VE opined that there would be some light jobs that such an individual could perform,

including photocopying machine operator (light exertional level and unskilled) (approximately 35,000 jobs), housekeeper (light exertional level and unskilled) (approximately 250,000 jobs), and restroom attendant (light exertional level and unskilled) (approximately 70,000 jobs). Tr. 51-52. The ALJ then added to the hypothetical a limitation that the person would be off-task 20 percent of the time because of pain and psychological symptoms. Tr. 53. The VE concluded that, based on this additional limitation, the person would not be able to perform any jobs on a competitive basis in the economy. Tr. 53.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

 In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). Under this analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") and vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his November 2009 decision, the ALJ found that Cintron had not engaged in any substantial gainful activity since November 28, 2006, the application date. Tr. 11. The ALJ determined that Cintron had the following severe impairments: anxiety, depression, and fibromyalgia. Tr. 11. The ALJ found that Cintron did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, Subpt. P , App. 1. Tr. 11. The ALJ next determined that Cintron retained the RFC to perform a range of light work subject to the following limitations: she can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; she can sit for six hours and stand and/or walk

for six hours in a normal workday; she is limited to unskilled work involving simple, repetitive tasks and to low-stress work that does not involve high production quotas; and she is limited to superficial interaction with the public and coworkers. Tr. 12. The ALJ then determined that Cintron had no past relevant work. Tr. 17. Finally, considering her vocational factions, RFC, and the testimony of the VE, the ALJ found that Cintron was capable of performing work that existed in significant numbers in the national economy. Tr. 17. Thus, the ALJ concluded that Cintron was not disabled. Tr. 18.

## V. Arguments of the Parties

Cintron challenges the Commissioner's decision on one ground: that the ALJ did not properly evaluate the opinions of Dr. Osorio and Dr. Jacobs under the treating physician rule.[1] In response, the Commissioner argues that the ALJ undertook a comprehensive evaluation of the overall evidentiary record, properly evaluated the opinions of Dr. Osorio and Dr. Jacobs, and reasonably determined that Cintron was not disabled.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

---

[1] In her Brief on the Merits, Cintron also appears to argue that the ALJ did not properly analyze her complaints of pain. Doc. 16, pp. 16-17. However, there are only two sentences on this argument in Cintron's Brief and it appears that this argument was included by mistake. Regardless, it is well-settled that issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. *See, e.g., McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997). Cintron has completely failed to develop this argument and, as a result, it is deemed waived.

1030 (6th Cir. 1992).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.      The ALJ Properly Evaluated the Medical Source Opinions**

Cintron argues that the ALJ failed to follow the treating physician rule in evaluating the opinions of Dr. Osorio and Dr. Jacobs.  Doc. 16, p. 6.  Specifically, Cintron asserts that the ALJ's determination to give little weight to the opinions of Dr. Osorio and Dr. Jacobs is against the weight of the evidence.  These arguments are without merit.

Under the treating physician rule, an ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the

opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors which tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(d), 416.927(d). However, the ALJ is not obliged to explain the weight afforded to each and every factor that might pertain to the medical source opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 F. App'x. 802, 804 (6th Cir. 2011). Clear articulation of how the treating physician rule is applied allows a claimant to understand the rationale for the Commissioner's decision and it allows for meaningful review of the ALJ's application of the treating physician rule. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242-43 (6th Cir. 2007).

    **1.    Dr. Osorio**

Dr. Osorio completed two assessments of Cintron's physical limitations and opined that Cintron could not lift more than two pounds and could not sit, stand, or walk for more than two hours per day. Tr. 192-193, 365-366. Dr. Osorio also concluded that Cintron was completely unable to stoop and was only able to reach above and below shoulder level occasionally. Tr. 366. In his written decision, the ALJ gave little weight to Dr. Osorio's opinions. Tr. 16. This determination is supported by substantial evidence.

The ALJ thoroughly evaluated Dr. Osorio's opinions and reasonably found that they were not supported by other evidence in the record or Dr. Osorio's own treatment notes. The ALJ explained, for example, that Cintron cooked, cleaned, and prepared meals, which suggested that she could carry more than two pounds. Tr. 15. In addition, the ALJ noted that there was absolutely no evidence that Cintron had any limitations with sitting, standing, or walking. Tr. 16. The ALJ also explained that Cintron's ability to care for her home demonstrated that she did not have manipulative limitations. Tr. 16. The ALJ's explanation demonstrates that he properly

discounted Dr. Osorio's opinions under the factors of supportability and consistency.  Thus, the ALJ stated good reasons for discounting the opinions of Dr. Osorio and complied with agency regulations.  *See, e.g., Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (finding that an ALJ provided good reasons for discounting treating physician opinion where the ALJ's stated reason was brief but reached several of the factors an ALJ must consider when determining what weight to give non-controlling opinion).

A review of the record reveals that the reasons provided by the ALJ for discounting Dr. Osorio's opinions are supported by substantial evidence.  For example, in October 2006, when Dr. Osorio found that Cintron had a severe muscle spasm in the trapezius, she also found that Cintron had a steady gait, her muscle strength was 5/5 in the upper and lower extremities, her reflexes were brisk, and there was no active synovitis.  Tr. 151.  Likewise, in November 2006, Dr. Osorio found that Cintron had good range of motion, full muscle strength in the upper and lower extremities, and a steady gait.  Tr. 150-151.  In December 2006, a review of Cintron's systems was normal, an MRI on her cervical spine was negative, and her blood work for rheumatoid and lupus was negative.  Tr. 149.  Furthermore, in March 2009, Dr. Osorio even recommended that Cintron go swimming to help with her myalgia.  Tr. 332.  These findings are at odds with Dr. Osorio's opinion that Cintron had severe physical limitations.

Cintron's own statements about her abilities and limitations are also inconsistent with Dr. Osorio's opinions.  In September 2008, Cintron told Dr. Osorio that she was "doing well" and had recently been able to travel to Puerto Rico.  Tr. 336.  As the ALJ explained, the fact that Cintron could sit on the long flight to Puerto Rico is contradictory to the severe restriction on sitting found by Dr. Osorio.  Tr. 16.  Furthermore, Cintron stated that she independently cared for her two disabled children, drove a car, did laundry, cooked, and attended school functions.

Tr. 14, 30-34. And, in February 2007, Cintron admitted that she was able to help her mother-in-law move a large sofa and other furniture. Tr. 14, 225. All of this evidence supports the ALJ's decision that Cintron physical impairments did not rise to a disabling level.

Moreover, the state agency reviewing physician, Dr. Klyop, found that Cintron's impairments did not rise to a disabling level. Significantly, agency regulations provide that state agency reviewing sources are highly skilled medical professionals who are experts in social security issues. *See* 20 C.F.R. § 416.927. In May 2007, the Dr. Klyop assessed Cintron as capable of occasionally lifting 50 pounds, frequently lifting 25 pounds, and standing/walking and sitting for six hours each in an eight-hour workday. Tr. 180. He found no other limitations. Tr. 179-186. In support of his conclusions, Dr. Klyop cited Dr. Osorio's November 2006 examination, which noted a good range of movement and a 5/5 in muscle strength. Tr. 180. Dr. Klyop noted that, although Cintron complained of having back pain, she had a negative MRI, did not have arthritis, and had a steady gait. Tr. 180. The ALJ gave weight to Dr. Klyop's opinions on sitting, standing and walking. Tr. 16. However, resolving all doubt in Cintron's favor, the ALJ imposed even greater limitations on Cintron's ability to lift and carry than those assessed by Dr. Klyop in his RFC determination. Tr. 12, 16.

In sum, the ALJ provided good reasons for assigning little weight to the opinions of Dr. Osorio. This decision is well supported by the medical evidence and Cintron's own statements about her daily activities and abilities. Accordingly, the ALJ complied with the treating physician rule and properly evaluated Dr. Osorio's opinions.

### 2. Dr. Jacobs

Dr. Jacobs completed two assessments of Cintron's mental limitations and opined that Cintron had poor or no ability in the following areas: to relate to coworkers, deal with the public,

interact with supervisors, deal with work stress, maintain attention and concentration, perform complex tasks, and perform detailed but not complex jobs. Tr. 16, 219-220, 368-369. The ALJ gave little weight to Dr. Jacobs' opinions. Tr. 16-17. This conclusion is supported by substantial evidence.

In reaching his decision, the ALJ thoroughly evaluated the opinions of Dr. Jacobs and found that these opinions were not supported by the objective evidence or by Cintron's wide range of daily activities. Tr. 16. For example, the ALJ explained that the fact that Cintron was able to take care of her two children, who were both disabled, without any particular assistance, established that she is not as limited as found by Dr. Jacobs. Tr. 16. In addition, the ALJ noted that Cintron was able to attend school functions, drive a car, and travel to Puerto Rico. Tr. 14, 16, 30-34, 195. She also visits with a friend every day. Tr. 14, 195. Further, Cintron was able to be in a relationship with her boyfriend. Tr. 14, 251, 346, 357, 360. And, after that relationship ended, she was able to enter into a new relationship. Tr. 14, 251, 346, 357, 360. The ALJ also noted that Cintron testified at the hearing that she had no difficulty interacting with coworkers or the public at her job as a security guard at Cleveland Browns Stadium in 2005. Tr. 15, 40. The ALJ concluded that this evidence demonstrates that Cintron is not as limited as found by Dr. Jacobs. The ALJ's explanation demonstrates that he properly discounted Dr. Jacobs' opinions under the factors of supportability and consistency. Thus, the ALJ stated good reasons for discounting the opinions of Dr. Jacobs and complied with agency regulations.

Dr. Jacobs' opinions are also inconsistent with the opinions of the state agency reviewing psychologists and the opinion of Dr. Felker, the independent consultative examining psychologist. Indeed, all of these doctors expressed opinions that are consistent with the ALJ's ultimate decision. For example, state agency reviewing psychologist Dr. Williams found Cintron

to be capable of simple, routine tasks in a relatively static environment where she can mostly work alone. Tr. 177. Similarly, in April 2007, Dr. Felker evaluated Cintron and found that she only had mild impairments in her ability to concentrate and attend to tasks. Tr. 159. Dr. Felker also found that Cintron had only a mild impairment in her ability to relate to others and deal with the general public, and moderate impairments in her ability to relate to work peers and supervisors, and to tolerate the stress of employment. Tr. 159. The ALJ appropriately accommodated these limitations in his RFC determination by concluding that Cintron was limited to simple, repetitive, low-stress work, involving superficial interaction with the public and coworkers, and not involving high production quotas. Tr. 12. These significant limitations are reflective of the evidence and are supported by substantial evidence.

Overall, the ALJ provided good reasons for assigning little weight to the opinions of Dr. Jacobs. Again, this decision is well supported by the medical evidence and Cintron's daily activities and abilities. Accordingly, the ALJ complied with the treating physician rule and properly evaluated Dr. Jacobs' opinions.

### VII. Conclusion and Recommendation

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff Elisha Cintron's application for SSI should be AFFIRMED.

Dated: December 6, 2011

Kathleen B. Burke
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).